**Reverse and Render and Memorandum Opinion filed July 24, 2025**



In The

# Fifteenth Court of Appeals

## NO. 15-24-00048-CV

**TEXAS MEDICAL BOARD, Appellant**

**V.**

**GRAYCE YANNUZZI, Appellee**

**On Appeal from the 419th District Court**
**Travis County, Texas**
**Trial Court Cause No. D-1-GN-23-001175**

### MEMORANDUM  OPINION

Appellant Texas Medical Board (the "Board") issued a cease-and-desist order prohibiting Grayce Yannuzzi from holding herself out to be a licensed physician. Yannuzzi filed suit for judicial review of the order in the trial court, which issued a judgment voiding the cease-and-desist order. The Board then appealed to this Court.

Because we conclude that substantial evidence supports the Board's decision to issue the cease-and-desist order, we reverse the trial court's judgment and render

in favor of the Board.[1]

## BACKGROUND

Grayce Yannuzzi is a licensed laser hair professional who works at Ginger Allure MedSpa ("MedSpa"). She is not licensed to practice medicine in the State of Texas or in any other state.

In May 2022, Yannuzzi and her family were dining at a Santa Rita Cantina in New Braunfels when Yannuzzi's sister, Katie Bonn, became overheated. Bonn—feeling dizzy, light-headed, and nauseous—went to the bathroom, which was air-conditioned. Someone in the restaurant called 911, and the New Braunfels Emergency Medical Service ("EMS") subsequently arrived. Bonn, while in the restroom, told Yannuzzi that she did not want to be treated by EMS. Yannuzzi approached Christopher Stevens, a responding paramedic, and told him that Bonn did not need help. The parties differ as to what Yannuzzi said next to Stevens. The Board argues, citing Stevens's testimony, that Yannuzzi represented to Stevens that Yannuzzi was a physician, was taking care of Bonn, and had given her medication.

Yannuzzi gives a different account, citing her own testimony that Yannuzzi had spoken to her MedSpa supervising physician, Dr. Clark, about Bonn's symptoms before speaking to Stevens. Per this testimony, Dr. Clark gave Yannuzzi "a list of things to watch out for" with Bonn and instructions to follow up with Dr. Clark if anything changed. Accordingly, Yannuzzi told Stevens that Bonn did not need

---

[1] After briefing on the merits were filed, we *sua sponte* requested the parties provide additional briefing on whether this Court has jurisdiction to hear this matter because Yannuzzi did not file a motion for rehearing before filing a petition for review in the trial court. The Board has not demonstrated that this cease-and-desist-order proceeding is a "contested case" such that a motion for rehearing is required. Tex. Gov't Code § 2001.003(1) (defining a contested case to include a "ratemaking or licensing proceeding, in which the legal rights, duties, or privileges of a party are to be determined by a state agency after an opportunity for adjudicative hearing"). Accordingly, we proceed to address the merits.

medical assistance because she was already under a physician's care.

The parties do not dispute that at some point during this exchange, Stevens handed Yannuzzi his clipboard, and she wrote Dr. Clark's contact information down. Stevens then called EMS medical director Dr. Heidi Abraham and handed his phone to Yannuzzi. The parties disagree as to what Yannuzzi said to Dr. Abraham. The Board argues, citing Dr. Abraham's testimony, that Yannuzzi told Dr. Abraham that Yannuzzi was a physician and planned to give Bonn IV fluids. Yannuzzi counters, citing her own testimony, that she explained to Dr. Abraham that she had spoken to Dr. Clark, who told Yannuzzi that Bonn did not need an IV.

After this exchange, Yannuzzi gave Stevens's phone to Bonn, who told Dr. Abraham that she did not need ambulatory care. Bonn, in due course, came out of the bathroom and left the restaurant. Suspecting that Yannuzzi had unlawfully practiced medicine during this incident, Board staff opened an investigation and then applied to the Board for a cease-and-desist order prohibiting Yannuzzi from engaging in the unlawful practice of medicine in violation of the Medical Practice Act ("MPA"). After a hearing, the Board issued the cease-and-desist order, which determined in its findings of fact and conclusions of law that Yannuzzi violated the MPA by engaging in the unauthorized practice of medicine without a license. The order also prohibited Yannuzzi from acting as or holding herself out to be a licensed physician.

Yannuzzi filed a suit for judicial review challenging the order in the trial court below. After briefing and oral argument, the trial court issued a judgment voiding the cease-and-desist order on the grounds that substantial evidence did not support the Board's finding that Yannuzzi unlawfully practiced medicine. The Board thereafter filed this appeal.

3

## STANDARD OF REVIEW

The focus of this Court's review, as in the trial court, is on the Board's cease-and-desist order. We review the order for substantial evidence. Tex. Gov't Code § 2001.174 (applicable when "the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review"). Under substantial evidence review, we reverse the Board's decision only if Yannuzzi's substantial rights have been prejudiced because the order was:

(A) in violation of a constitutional or statutory provision;

(B) in excess of the agency's statutory authority;

(C) made through unlawful procedure;

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Id.* § 2001.174(2).

"Whether there is substantial evidence to support an agency's decision is a question of law." *Tex. Dep't of Pub. Safety v. Flores*, No. 15-24-00018-CV, 2024 WL 4887998, at *2 (Tex. App.—15th Dist. Nov. 7, 2024, no pet.) (mem. op.). Substantial evidence review "does not allow a court to substitute its judgment for that of the agency." *R.R. Comm'n of Tex. v. Torch Operating Co.*, 912 S.W.2d 790, 792 (Tex. 1995).

"Review under the substantial-evidence rule is highly deferential—the issue is not whether the agency's decision is correct, but whether the record demonstrates a reasonable basis for it." *N.E. Indep. Sch. Dist. v. Riou*, 598 S.W.3d 243, 251 (Tex. 2020). Substantial evidence supporting an administrative agency's decision

4

"requires only more than a mere scintilla, and 'the evidence [i]n the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence.'" *R.R. Comm'n*, 912 S.W.2d at 792–93 (quoting *Tex. Health Facilities Comm'n v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 452 (Tex. 1984)). "The findings, inferences, conclusions, and decisions of an administrative agency are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise." *Tex. Comm'n on Env't Quality v. Maverick Cnty.*, 642 S.W.3d 537, 547 (Tex. 2022) (quoting *Charter Med.-Dall.*, 665 S.W.2d at 453).

We review the meaning of a statute de novo. *Davis v. Morath*, 624 S.W.3d 215, 221 (Tex. 2021). "When construing a statute, our primary objective is to determine the Legislature's intent which, when possible, we discern from the plain meaning of the words chosen." *Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 253 (Tex. 2023) (quoting *In re Est. of Nash*, 220 S.W.3d 914, 917 (Tex. 2007)). Words not "statutorily defined bear the common, ordinary meaning unless a more precise definition is apparent from the statutory context or the plain meaning yields an absurd result." *Id.* (quoting *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018)).

## ANALYSIS

Under the Medical Practice Act, a person may not "practice medicine" in Texas unless that person holds a license issued by the Board. Tex. Occ. Code §§ 155.001, 155.002. "Practicing medicine" under the MPA—Section 151.002 of the Texas Occupations Code—means "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method . . . by a person who publicly professes to be a physician . . . ." *Id.* § 151.002(13). The MPA authorizes the Board to "issue a cease and desist order prohibiting" an unlicensed person who is violating the MPA "from engaging in

5

[such] activity." *Id.* § 165.052(a).

In two issues, the Board challenges the trial court's judgment voiding the order. The Board argues that substantial evidence supports that Yannuzzi under the MPA (1) publicly professed to be a physician and (2) diagnosed and offered to treat a physical disease, disorder, deformity, or injury. Yannuzzi argues that when the governing law is properly construed, the Board's order is not supported by substantial evidence. We address these issues in turn.

## I.    Yannuzzi Publicly Professed to be a Physician

The Board argues that substantial evidence supports the cease-and-desist order's findings that Yannuzzi "publicly professed" to be a physician because testimonial evidence shows that she represented herself as a physician to Stevens and Dr. Abraham. *Id.* § 151.002(13). Yannuzzi also argues that her communications to Stevens and Abraham were private and not public. Yannuzzi also argues that her communication of Bonn's refusal of care to EMS personnel does not constitute the practice of medicine. Finally, Yannuzzi contends that substantial evidence does not support the order's findings that she publicly professed to be a physician.

Substantial evidence supports the Board's order. Stevens testified at the administrative hearing that Yannuzzi told him "[Yannuzzi] was the physician who was going to take care of her sister." Dr. Abraham testified that Yannuzzi "repeated multiple times that she was a physician." Yannuzzi denies that she ever represented herself as a physician, but "[r]eview under the substantial-evidence rule is highly deferential—the issue is not whether the agency's decision is correct, but whether the record demonstrates a reasonable basis for it." *Riou*, 598 S.W.3d at 251. The Board's determination that Yannuzzi publicly professed to be a physician only needs to be supported by more than a "scintilla" of evidence, meaning the Board's finding will be upheld even if the evidence preponderates against it. *R.R. Comm'n*, 912

6

S.W.2d at 792–93. Stevens and Dr. Abraham's testimonial evidence amount to more than a scintilla of evidence in support of the Board's decision.

Yannuzzi objects that these alleged professions were made in private, one-on-one conversations with Stevens and Dr. Abraham and are not "public" communications required to satisfy the MPA's definition of "practicing medicine." Yannuzzi contends that "publicly" professing means communicating to the people as a whole or many individuals and not to individual conversations. Although "public" can refer to a group of people or people as a whole, it can also mean "exposed to general view" and "open." *Public*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2023). Here, there is evidence that—while in the Santa Rita Cantina, a public place—Yannuzzi communicated to Stevens and Dr. Abraham that Yannuzzi was a physician. Yannuzzi did not have a prior relationship with Stevens or Dr. Abraham, both personnel of the City of New Braunfels; they were strangers. Yannuzzi was not professing to be a physician to a close-knit group of friends and family within the confines of her private residence. She was professing to be a physician in a public place to city personnel who had not yet even provided care to the patient. There was nothing private about this interaction as it was recounted by Stevens and Dr. Abraham.

The context of the MPA also makes clear that publicly professing to be a physician can involve interactions between individuals. The MPA's purpose provision states "the practice of medicine is a privilege and not a natural right of individuals and as a matter of public policy it is necessary to protect the public interest through enactment of [the MPA] to regulate the granting of that privilege and its subsequent use and control . . . ." Tex. Occ. Code § 151.003(1). The authority to so regulate is granted to the Board. *Id.* § 151.003(2). The Board's purpose is therefore to protect the public by ensuring those practicing medicine are suitably

qualified and to regulate the practice of medicine itself. Yannuzzi's interpretation of "publicly professes" would undermine this purpose of the MPA. *Id.* § 151.002(13). Under Yannuzzi's interpretation, a person would be permitted by law to falsely represent to any stranger that she is a physician and even treat that stranger without charge,[2] so long as she makes the representation in a one-on-one conversation. Adopting Yannuzzi's interpretation would mean such persons could effectively "practice medicine" without any oversight from the Board. This would flout the purpose of the MPA, which is to protect the public interest from unqualified persons practicing unregulated medicine. *Id.* § 151.003(1).

Yannuzzi also makes a number of other challenges to the Board's findings. She argues that she did not violate the MPA because she never told Bonn she was a physician and Bonn knew Yannuzzi was not a physician. But the basis for the Board's finding of Yannuzzi's violation is not her communications to Bonn but rather her communications to Stevens and Dr. Abraham, who did not know Yannuzzi was not a physician.

Next, Yannuzzi objects that the Board's finding of fact in the order that Yannuzzi "refused to let the [EMS] evaluate the patient" was merely a refusal of care and not a public representation that she was a physician. That is not a full statement of the Board's finding of fact. The full language of the finding of fact provision states "[Yannuzzi] refused to let the [EMS] evaluate the patient *and explained that she was a physician, and that the patient was under her care.*" (emphasis added). The italicized language makes clear that Yannuzzi's mere refusal of care on Bonn's behalf does not amount to publicly professing to be a physician. Her representation to EMS—Stevens and Dr. Abraham—that she was a physician

---

[2] A person "directly or indirectly charg[ing] money or other compensation for" the medical services is also "practicing medicine" as defined by Section 151.002(13).

does.

Finally, Yannuzzi objects that substantial evidence does not support that she publicly professed to be a physician. On this point, Yannuzzi argues that the Board wrongly considered a third-party website listing Yannuzzi as an "MD" as evidence against her in reaching its decision; the listing is a finding of fact in the order. However, the Board now concedes that this finding is erroneous and so we do not rely on it. Yannuzzi contends that the listing nonetheless prejudiced the Board's determination that Yannuzzi publicly professed to be a physician, but there is no evidence that this is the case. Rather, the testimony of Stevens and Dr. Abraham adequately support the Board's findings.

Yannuzzi argues that Stevens and Dr. Abraham misunderstood her and that she never represented herself as a physician. Yannuzzi testified that she was referring to her supervising physician, Dr. Clark, when speaking to Stevens and Dr. Abraham and that she wrote Dr. Clark's contact information when Stevens gave her his clipboard. Yannuzzi cites Dr. Abraham's testimony that she was "not aware of any circumstances in which a physician would have a supervising physician" in support of this interpretation. Yannuzzi contends this testimony indicates she did not hold herself out as a physician because if she did, she would not have needed to refer to Dr. Clark as a supervising physician.

To be sure, this is some evidence in favor of Yannuzzi's position. However, under the standard of review applicable here, we are still required to uphold the Board's decision so long as it is supported by some evidence, even if the evidence in the record may actually "preponderate against the decision of the agency . . . ." *R.R. Comm'n*, 912 S.W.2d at 793 (quoting *Charter Med.-Dall.*, 665 S.W.2d at 452). Under this highly deferential standard, Stevens and Dr. Abraham's testimony that Yannuzzi represented herself to them as a physician is adequate to support the

Board's determination that Yannuzzi publicly professed to be a physician under the MPA.

## II.     Yannuzzi Offered to Treat a Disorder

"Practicing medicine" under the MPA means "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method . . . by a person who publicly professes to be a physician . . . ." Tex. Occ. Code § 151.002(13). The Board argues the cease-and-desist order's conclusion that Yannuzzi practiced medicine is supported by substantial evidence that she diagnosed Bonn and offered to treat her. The Board argues that Yannuzzi diagnosed Bonn with being overheated and offered to treat her by telling Stevens and Dr. Abraham that she had given Bonn medication and intended to give her IV fluids. Yannuzzi responds that her conduct did not constitute "diagnosing" or "offering to treat" any "physical or mental disease, disorder, deformity, or injury" under the MPA. She also contends substantial evidence does not support that her conduct fell under these terms.

We hold that substantial evidence supports the cease-and-desist order's determination that Yannuzzi practiced medicine because she "offered to treat" a "disorder" of Bonn under the MPA.[3] Specifically, Dr. Abraham testified that Yannuzzi told her over the phone at the restaurant that "I'm going to take [Bonn] back to my clinic and give her IV fluids. I'm going to start an IV and give her IV fluids." This testimony is evidence of Yannuzzi offering to treat Bonn by giving her an IV.

There is also evidence that this proposed treatment was for a "disorder" under

---

[3] As we hold that Yannuzzi offered to treat a disorder, we need not and do not address whether Yannuzzi diagnosed or actually treated such a disorder. We also need not address whether Bonn suffered a mental or physical disease, deformity, or injury.

10

the MPA. Bonn testified that she felt "dizzy", "nauseous", and "light-headed" at the restaurant. "Disorder" is not defined in the MPA, but its plain meaning is broad. "Disorder" means "[a] disturbance in mental or physical health" or "an abnormal physical or mental condition." *Disorder*, BLACK'S LAW DICTIONARY (12th ed. 2024); *Disorder*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2023). Dizziness, nauseousness, and light-headedness are evidence of "disturbances" and "abnormalities" in Bonn's health. These symptoms are what led to the EMS being called to the restaurant in the first place and why Yannuzzi felt the need to call Dr. Clark.

Yannuzzi makes three statutory interpretation arguments to explain why the Board's order should be reversed nevertheless. First, Yannuzzi argues that merely caring for an ailing family member does not constitute the practice of medicine. According to Yannuzzi, if the order is left to stand, parents and other family caregivers could be subject to cease-and-desist orders by the Board merely for fulfilling their caregiving obligations. Accordingly, Yannuzzi argues that the statute should be interpreted to exclude family caregiving from the purview of "practicing medicine."

Yannuzzi's conclusion does not follow. Yannuzzi ignores that caring for an ailing family member—by itself—is not enough to constitute "practicing medicine" under the MPA. Rather, the person providing care must also "publicly professes to be a physician . . . ." Tex. Occ. Code § 151.002(13). We agree that it is common practice for parents and family caregivers to treat their family members for ailments with over-the-counter medications. But it is not common practice for parents and family caregivers to hold themselves out publicly as physicians when they are doing so. The *combination* is prohibited by the Occupations Code—not family caregiving standing alone. As such, there is no danger that interpreting the MPA as written

11

would interfere, for example, with a mother's ability to provide an over-the-counter pain reliever to a child who comes home with a headache. We must interpret the text of the law as written. The MPA does not categorically exclude family caregiving from the definition of "practicing medicine" when such caregiving is accompanied by a false public representation of physician status, and we cannot rewrite the statute to contain such an exclusion.

Second, Yannuzzi objects that if the Board is correct that she unlawfully practiced medicine, then many other common instances of care would amount to practicing medicine. Yannuzzi provides a list of examples, including "[a] professional coach tell[ing] a player that he's overheated and needs to sit in the shade" and "[t]he cashier at H-E-B tell[ing] a customer that this particular brand of sports drink with electrolytes cures dehydration . . . ." This objection paints a frightening picture that all of us have at some point in our lives unlawfully practiced medicine—whether it be by caring for a loved one, an injured community member, or even a stranger. But this picture is not what the MPA paints. The MPA is clear that merely "diagnos[ing], treat[ing], or offer[ing] to treat" a "mental or physical disease or disorder or a physical deformity or injury" is not enough to constitute "practicing medicine." *Id.* § 151.002(13). The person providing treatment must also "publicly profess[] to be a physician or surgeon" or "directly or indirectly charge[] money or other compensation for those services." *Id.*

This interpretation of the statute furthers the objectives of the MPA. The Legislature enacted the MPA to protect the public by regulating the practice of medicine and ensure only those who are qualified practice it. *Id.* § 151.003(1) ("[T]he practice of medicine is a privilege and not a natural right of individuals and as a matter of public policy it is necessary to protect the public interest . . ."); § 155.001 ("A person may not practice medicine in this state unless the person holds

a license issued under this subtitle."); § 165.052(a) (authorizing the Board to issue cease-and-desist orders prohibiting unlicensed persons from violating the MPA). Non-physicians professing to be physicians creates uncertainty within the general population because members of the public would not know if someone professing to be a physician is in fact a licensed physician. This uncertainty in turn undermines the public trust in the medical judgment and expertise of licensed physicians. The MPA strikes a balance between allowing the general public to provide medical aid while simultaneously prohibiting persons from falsely representing to be physicians when rendering such aid.

Third, Yannuzzi argues that we should interpret the MPA's prohibition on "practicing medicine" to exclude her conduct because her conduct in caring for a family member is not connected with the practice of medicine in a manner that is likely to deceive the public. For support, Yannuzzi cites *Aleman v. Texas Medical Board,* a case in which the Board sought to discipline a physician under the MPA physician disciplinary provision for certifying a former patient's death certificate manually as opposed to electronically, as state law requires. 573 S.W.3d 796, 802 (Tex. 2019). The Board determined that the physician engaged in unprofessional conduct in violation of the disciplinary provision because, by failing to follow the certification requirement, he committed an act in contravention of state law that was "connected with the physician's practice of medicine . . . ." *Id.* at 799–800; Tex. Occ. Code § 164.053(1). The trial court and court of appeals in pertinent parts affirmed. *Aleman*, 573 S.W.3d at 800. The Texas Supreme Court reversed, holding the physician's failure to follow the certification requirement did not warrant disciplinary action because the violation was not "connected with" his practice of medicine "in a manner that ma[de] it likely to deceive or defraud the public." *Id.* at 802, 804–05.

*Aleman* is inapposite. In *Aleman*, the physician was disciplined under MPA provisions prohibiting the commission of "unprofessional or dishonorable conduct that is likely to deceive or defraud the public," Tex. Occ. Code § 164.053(a), which included an "act that violates any state or federal law if the act is connected with the physician's practice of medicine," *id*. § 164.053(a)(1). *Aleman*, 573 S.W.3d at 799. Those provisions are not at issue here. Rather, this case concerns the MPA's prohibition on nonphysicians "practicing medicine" "unless the person holds a license issued under this subtitle." Tex. Occ. Code § 155.001. There is no requirement that such person also "deceive or defraud the public" or violate "state or federal law."

Yannuzzi also challenges the order on two evidentiary grounds. First, Yannuzzi objects that her refusal to let EMS personnel evaluate Bonn does not constitute practicing medicine. Yannuzzi elaborates that such refusal is at best impeding medical care rather than wrongfully providing that care. Yannuzzi misstates the issue. It was not Yannuzzi's refusal to let EMS personnel evaluate Bonn that constitutes the practice of medicine. Rather, it was her representations to Stevens and Dr. Abraham that she was a physician and that she intended to give Bonn IV fluids to treat her condition that constitutes the practice of medicine.

Second, Yannuzzi argues that substantial evidence does not support that she "offered treatment" to Bonn because Bonn never received treatment. Moreover, according to Yannuzzi, she never made any offer of treatment to Bonn herself. The statement pertaining to IV fluids was between Yannuzzi and Dr. Abraham—Bonn was not involved. Bonn did not need to receive treatment for Yannuzzi's conduct to constitute the practice of medicine. The MPA states the "offer to treat" a disorder— along with professing to be a physician—is sufficient. *Id.* § 151.002(13). "Offering to treat" a disorder is an independent ground for practicing medicine under the MPA

from the actual "treating" of the disorder. *Id.* The MPA practicing-medicine definition also does not specify the person to whom the offer is made, only that the offer must be made by someone either professing to be a physician or charging money for the offered services. *Id.* We cannot craft limitations onto the MPA's applicability that the Legislature did not craft itself.

Finally, Yannuzzi objects that the Board's failure to reference a specific physical or mental disorder is "fatal" to the order. Yannuzzi, however, points to no authority that would require the Board's findings of fact to identify the exact disorder that was the subject of an offer of treatment. The record contains evidence that Bonn was experiencing dizziness and nausea. The substantial evidence standard of review requires only that "the record demonstrates a reasonable basis for" the Board's decision. *Riou*, 598 S.W.3d at 251. The Board in its conclusions of law section concluded that "[Yannuzzi's] conduct, as described above, shows that [Yannuzzi] has engaged in the unauthorized practice of medicine without a license and has violated the MPA . . . ." At this stage of the proceedings, the Court need only determine whether substantial evidence within the record supports this decision. As shown in both Parts I and II above, Stevens and Dr. Abraham's testimony "demonstrates a reasonable basis for" the Board's decision. *Id.*

## CONCLUSION

We reverse the trial court's judgment voiding the cease-and-desist order and render judgment affirming the order.

s/ April Farris
April Farris
Justice

Before Chief Justice Brister and Justices Field and Farris.

15